UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSE LUIS SANCHEZ,

                                        Plaintiff,

                    -v-

E.I.G. AUTO SALVAGE, INC., RICHARD UFFER,
*individually*, MONICA GONZALEZ, *individually*,

                                        Defendants.

---

21 Civ. 8266 (PAE) (SN)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This decision sets out the Court's findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52, following a four-day, non-jury trial brought under the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and New York Labor Law ("NYLL"),

§§ 190 *et seq.* & §§ 650 *et seq.* *See* Dkts. 118, 120, 122 ("Trial Transcript" or "Tr."); Dkt. 124

("Closings").

Plaintiff Jose Luis Sanchez ("Sanchez") is a former employee of defendant E.I.G. Auto

Salvage, Inc. ("EIG"), an automobile junkyard in the Bronx. He alleges that EIG, its owner

Richard Uffer, and its manager Monica Gonzalez (collectively, "defendants"), failed to (1) pay

him statutorily mandated overtime wages, in violation of the FLSA and NYLL's overtime

provisions, and (2) provide adequate wage hire notices and wage payment statements, in

violation of NYLL, Article 6, §§ 195(1) and (3). Dkt. 17 ("Amended Complaint" or "AC")

¶¶ 54–72. He attests to have worked at EIG between 2017 and 2020, and seeks damages for

unpaid overtime wages and statutory penalties for the wage notice and statement violations.

Defendants concede that they did not provide the statutorily mandated wage notice or statements.

1

They assert, however, that Sanchez worked as a full-time employee of EIG in 2020 only and that he was fully compensated for all work performed.

Between January 24–27, 2023, the parties tried the case before the Court. Sanchez testified and called EIG employees Edward Calvert and Luis Baez as witnesses. Defendants called eight witnesses, including Lisbeth Karen Montoya Maruri, Bernard Jones, and Patrick Rattray, who worked or currently work in some capacity for EIG; Francisco Portes, Wilkin Suero Alcantara, and Daniel Parella, who conduct business with EIG; and Gonzalez and Uffer.[1] Sanchez and various witnesses who speak Spanish as their primary language testified with the assistance of a translator.[2]

For the following reasons, the Court finds that Sanchez has not proved, by a preponderance of the evidence, that defendants failed to properly compensate him for his overtime work. The Court further finds that, because Sanchez has not demonstrated defendants' failure to properly compensate him, defendants are entitled to an affirmative defense as to their violations of the wage notice and statement requirements. Accordingly, judgment for defendants is warranted on all counts.

---

[1] For witnesses' convenience, each witness testified only once. Each party had the opportunity to conduct cross-examination beyond the scope of the direct examination of any witness called by the opposing party. Tr. 21–22.

[2] The Court permitted translation by an interpreter who was not court-certified, pursuant to the parties' consent and the interpreter's representations that he had served as an interpreter in at least 200 depositions and four trials. Tr. 30–32. The parties waived their right to challenge the translation or qualifications of the interpreter. *Id.* 33–34.

## FINDINGS OF FACT[3]

### I.    The Parties

#### A.    Defendants

EIG is an automobile junkyard, or auto salvage yard, incorporated under New York law and located at 3515 Heathcote Ave, Bronx, NY 10475. JPTO at 6; AC ¶ 13. During the time period relevant to this decision, EIG grossed more than $500,000 per year and received tools from outside New York State. JPTO at 6.

Uffer and Gonzalez established EIG at some point in 2017, in the same location as a previous junkyard, Marbo Used Auto Parts ("Marbo"), which vacated the premises at the end of July 2017. Tr. 397–99 (Uffer); *id.* 508–10 (Gonzalez). Uffer, EIG's owner, provided the upfront funding for EIG, and Gonzalez, EIG's manager, handled day-to-day operations for most of the time period at issue. JPTO at 5; Tr. 397–98 (Uffer); *id.* 505 (Gonzalez); *see also id.* 49 (Sanchez). Uffer supervised EIG's employees on a daily basis starting in March 2020. Tr. 422–23 (Uffer); *id.* 575–76 (Gonzalez). Uffer and Gonzalez are married to each other. *Id.* 505 (Gonzalez).

EIG's business primarily entails receiving cars, extracting and recycling car parts, including engines and catalytic converters, and disposing of car bodies. *Id.* 399 (Uffer); *id.* 506–07 (Gonzalez). EIG also provides parts to exporters—individuals who purchase car parts from junkyards and ship containers of those parts to another country. *Id.* 413 (Uffer); *id.* 532 (Gonzalez). Gonzalez maintained a schedule to track the days on which workers would load

---

[3] The Court's findings of fact are drawn from the testimony at trial, *see* Dkts. 118, 120, 122 ("Trial Transcript" or "Tr."); the exhibits, which were marked at trial; the parties' joint pre-trial order, which contains certain stipulations of fact, Dkt. 83 ("Joint Pre-Trial Order" or "JPTO"); and the parties' proposed findings of fact and conclusions of law, Dkt. 75 ("Pl. Findings"); Dkt. 78 ("Defs. Findings"). The Court also cites herein to closing arguments. Dkt. 124 ("Closings").

containers of EIG-sourced car parts for exporters. *Id.* 533 (Gonzalez). These loading jobs could be scheduled weeks or months in advance and typically took place in EIG's yard on Saturdays, with either Gonzalez or Uffer present to supervise the yard. *Id.* 533, 536, 639 (Gonzalez). Defendants testified that, at times, Gonzalez would procure workers to load the containers for the exporters. *Id.* 414, 422 (Uffer); *id.* 533 (Gonzalez).

Gonzalez is, to her knowledge, the only female salvage yard owner in New York City. *Id.* 518 (Gonzalez). Before establishing EIG, Gonzalez worked at another junkyard, New England Used Auto Parts ("New England"), which was owned by Julio Baez, her cousin.[4] *Id.* 406 (Uffer); *id.* 507–08 (Gonzalez). Gonzalez and Uffer state that Julio Baez reneged on his promise to make a 50% investment in EIG in exchange for a 50% ownership share in the business. *Id.* 398–99 (Uffer); *id.* 509–10 (Gonzalez). After Gonzalez and Uffer rejected Julio Baez's offer of non-monetary support in exchange for an interest in EIG, relations between Gonzalez and Julio Baez soured. *Id.* 510–11 (Gonzalez).

### B.    Plaintiff

Sanchez was born in Mexico and came to the United States at age 19. *Id.* 42 (Sanchez). He has a high school education. *Id.* 42 (Sanchez). Before working at EIG, Sanchez worked at factories and restaurants, and in construction. *Id.* 142 (Sanchez). In those jobs, his salary was typically calculated on a weekly basis, and he did not work more than 40 hours a week. *Id.* 143 (Sanchez). At the time of the trial, he was age 54. *Id.* 42 (Sanchez).

Before working at EIG, Sanchez worked at Marbo for approximately 20 years. *Id.* 112, 148–49 (Sanchez). In July 2017, Marbo closed, and Sanchez took three weeks off from work.

---

[4] To avoid confusion between Julio Baez and his son, Luis Baez, the Court refers to them by their first and last names.

*Id.* 112–13 (Sanchez). He then worked at Alpha Recycling, a scrap metal facility in the same neighborhood as EIG, for six months. *Id.* 113, 116 (Sanchez); *id.* 312 (Montoya).

As discussed below in Section III, the parties centrally dispute the duration of Sanchez's employment with EIG. At EIG, Sanchez's duties included cutting motors and removing radiators, tires, and gas tanks from cars. *Id.* 47 (Sanchez). He operated a blow torch on the job. *Id.* 47–48 (Sanchez). Sanchez also performed exporter-related work for EIG on some Saturdays. *Id.* 123–24, 128 (Sanchez). On May 19, 2020, during Sanchez's workday at EIG, a motor fell on Sanchez, injuring his foot. *Id.* 43, 60 (Sanchez). Uffer called an ambulance, and Sanchez went to the hospital. *Id.* 60, 64 (Sanchez); *id.* 426 (Uffer). On July 7, 2020, Sanchez filed a workers' compensation claim in connection with the injury. Defs. Ex. 3. After he recovered, he performed some work for EIG. *See* Tr. 141 (Sanchez); *id.* 580–81 (Gonzalez).

In September 2020, Sanchez was diagnosed with a brain tumor, which has caused headaches and problems with his vision. *Id.* 41–42 (Sanchez). Between the end of October 2020 and December 2022, Sanchez worked for Julio Baez at New England. *Id.* 113 (Sanchez).

On October 7, 2021, Sanchez filed this lawsuit. Dkt. 1.

## II.    Recordkeeping and Documentary Evidence

Defendants produced a single set of records as to Sanchez's employment at EIG: the Weekly Receipts.[5] *See* Defs. Ex. 2 ("Weekly Receipts"). For the following reasons, the Court finds that the Weekly Receipts are a reliable record of the hours Sanchez worked and the wages he earned at EIG.

The Weekly Receipts are handwritten and come in two slightly different formats: one recording payments between January 2020 and June 2020, and the other recording payments in

---

[5] Sanchez was not required to "clock in" or "clock out" to keep track of his hours at any point during his employment with EIG. JPTO at 6; Tr. 46–47 (Sanchez); *see also id.* 311 (Montoya).

July 2020. *See id.* The first batch of receipts includes the following information: the date of

payment, the total amount received, the name of the "payer" (noted as Sanchez), a description of

the payment, and the payment type. *Id.* at 1–8. The second batch of receipts includes largely the

same information, except that it provides a range of dates rather than an exact payment date and

it lists EIG as where the payment is "Received From." *Id.* at 9–10. Each receipt includes a

signature next to "Received By." *See id.*

    The receipts indicate the following:

- On January 24, 2020, Sanchez was paid $800 for 40 hours of work between January 20–24, 2020.
- On January 31, 2020, Sanchez was paid $800 for 40 hours of work between January 27–31, 2020.
- On February 8, 2020, Sanchez was paid for 46 hours of work. The amount paid is unclear, as there is a line between the 1 and 0. Accordingly, the amount paid could be read as "1100.00" or "1,00.00."[6] This receipt does not identify the work dates in connection with which the payment was made.
- On February 14, 2020, Sanchez was paid $800 for 40 hours of work between February 9–14, 2020.
- On February 22, 2020, Sanchez was paid $800 for 40 hours of work between February 17–22, 2020.
- On February 28, 2020, Sanchez was paid $800 for 40 hours of work between February 24–28, 2020.
- On March 6, 2020, Sanchez was paid $800 for 24 hours of work between March 2–6, 2020. The receipt indicates that he took two "sick days" that week.
- On March 14, 2020, Sanchez was paid $1,000 for 46 hours of work between March 9–14, 2020.
- On March 20, 2020, Sanchez was paid $800 for 40 hours of work between March 16–20, 2020.
- On March 27, 2020, Sanchez was paid $800 for 40 hours of work between March 23–27, 2020.

---

[6] Alternatively, because "1,00.00" is not a proper number, and because the amount paid for other 46-hour weeks was listed as $1,000, the figure on this line could be a typo, with $1,000 being the intended amount.

- On April 4, 2020, Sanchez was paid $1,000 for 46 hours of work between March 30–April 4, 2020.

- On April 10, 2020, Sanchez was paid $800 for 40 hours of work between April 6–10, 2020.

- On April 17, 2020, Sanchez was paid $800 for 40 hours of work between April 13–17, 2020.

- On April 25, 2020, Sanchez was paid $1,000 for 46 hours of work between April 20–25, 2020.

- On May 1, 2020, Sanchez was paid $800 for 40 hours of work between April 27–May 1, 2020.

- On May 8, 2020, Sanchez was paid $800 for 40 hours of work between May 4–8, 2020.

- On May 16, 2020, Sanchez was paid $1,000 for 46 hours of work between May 11–16, 2020.

- On May 22, 2020, Sanchez was paid $800 for 12 hours of work and "injured paid" between May 18–22, 2020.

- On May 29, 2020, Sanchez was paid $800 for "injured pay" for the period between May 25–29, 2020.

- On June 5, 2020, Sanchez was paid $800 for "injured pay" for the period between June 1–5, 2020.

- On June 12, 2020, Sanchez was paid $800 for "injured pay" for the period between June 8–12, 2020.

- On June 19, 2020, Sanchez was paid $800 for "injured pay" for the period between June 15–19, 2020.

- On June 26, 2020, Sanchez was paid $800 for "injured pay" for the period between June 22–26, 2020.

- On July 3, 2020, Sanchez was paid $800 for 32 hours of work and "no show due to leg issue" for the period between June 29–July 3, 2020.

- On July 17, 2020, Sanchez was paid $800 for 40 hours of work between July 13–17, 2020.

- On July 24, 2020, Sanchez was paid $800 for 32 hours of work and "7/20 no show" between July 20–24, 2020.

- On July 31, 2020, Sanchez was paid $800 for 40 hours of work between July 27–31, 2020.

*Id.* There is a line between the receipts for July 3 and July 17, 2020 that states: "Jose Out 6–10 July 2020." *Id.* at 9.

7

Sanchez disputes the authenticity of the Weekly Receipts. He testified that he did not receive "anything" with his weekly cash wages. Tr. 52–59 (Sanchez). He also stated that the signature on the receipts is not his signature. *Id.* 69–70 (Sanchez).

For several reasons, the Court credits as accurate the Weekly Receipts, and rejects Sanchez's claim that the Weekly Receipts were fabricated, forged, or otherwise inaccurate. As an initial matter, to the extent that Sanchez disputes the *existence* of any documentation of his weekly pay, *see id.* 52–59 (Sanchez), that position contradicts the parties' joint stipulation before trial that, between January and July 2020, "Sanchez received a copy of his Weekly Pay Receipt from Defendants from January 2020 to July 2020," JPTO at 6. It also contradicts the testimony of every other witness who was asked about the receipts, including the current or former full-time EIG employees who stated that, to receive their pay each Friday, they provided their signature, *see* Tr. 374 (Rattray); *see also id.* 203 (Calvert); *id.* 223 (Baez), and Gonzalez and Uffer, who attested to EIG's maintenance of weekly payment receipts for full-time employees. *See, e.g., id.* 500 (Uffer); *id.* 553, 588 (Gonzalez). The Court credits that EIG, which undisputedly paid its employees only in cash, had good reason to maintain such documentation of worker compensation, and did so. JPTO at 5; Tr. 52, 54, 55, 58 (Sanchez); *see* Closings 13 (plaintiff's counsel, stating that: "Employers don't give employees cash without a signature.").

The Court also finds highly credible the testimony of Lisbeth Karen Montoya Maruri—who goes by the surname Montoya—as to the authenticity of the Weekly Receipts. Montoya worked as EIG's secretary from the end of 2018 through the end of 2020, and, among other duties, paid workers each Friday. Tr. 289–90 (Montoya). She testified that she personally prepared the workers' pay receipts as follows: Each Friday, Gonzalez provided her with envelopes containing the week's cash wages for each employee. *Id.* 296 (Montoya). The

amount of cash inside each envelope was noted on the envelope. *Id.* 305 (Montoya). Montoya filled in the blanks on each employee's pay receipt, including the number of hours worked, based on a sticky note maintained by Gonzalez, which noted the days on which an employee was absent that week. *Id.* 293, 313 (Montoya). She calculated the hours by allocating eight hours per weekday worked. *Id.* 314 (Montoya). Montoya then asked each employee to sign the receipt before she handed them the envelope containing their weekly pay. *Id.* 299 (Montoya). Montoya stated that EIG produced some form of pay receipts throughout her time working at EIG, and that these receipts were the only record kept of employees' time. *Id.* 307, 311 (Montoya). Employees were offered a copy of the receipt if they asked, but none requested copies. *Id.* 300 (Montoya). As to the Weekly Receipts appearing to reflect Sanchez's pay, Montoya stated that she personally prepared the receipts on or about the dates indicated. *Id.* 298 (Montoya). She testified that Sanchez signed the receipts in her presence, *see id.* 299, 307 (Montoya); when asked about Sanchez's claim that he did not in fact sign the Weekly Receipts, she testified that that claim was untrue, *id.* 317 (Montoya). As for the weeks in which Sanchez was injured, Montoya testified that Sanchez personally signed the receipts for his weekly pay after he returned to EIG. *See id.* 320–23 (Montoya).

The Court credits Montoya's testimony that EIG maintained weekly receipts for Sanchez, the receipts reflected the information she received from Gonzalez regarding Sanchez's hours worked and wages earned, and Sanchez signed the receipts.[7] Montoya, who left EIG more than

---

[7] The Court does not credit Montoya's recollection that Sanchez signed *all* of his receipts in her presence, *see* Tr. 299, 307, 311 (Montoya). With respect to the weeks in which Sanchez worked Saturdays, that representation is questionable. Montoya worked only one Saturday during her time at EIG. *Id.* 308 (Montoya). According to defendants, employees who worked on Saturdays received their $800 payment for their weekday work on Friday and their $200 payment for their Saturday work on Saturday. *Id.* 590–93 (Gonzalez). Uffer stated that employees who worked on Saturdays signed their receipts for the week's full payment on the Friday before, as defendants

two years before the trial, did not have an apparent motive to lie on the stand. She testified

credibly and with specificity, and the documentation process that she described with respect to

the Weekly Receipts was commensurate with the needs and level of sophistication of a small,

cash-only business like EIG. When asked about inconsistencies in the receipts, Montoya

maintained that she followed this standard process in completing each receipt, and admitted

when she lacked the knowledge to explain any oddities or inconsistencies.[8] When confronted

with contrary testimony, she affirmed under oath that the Weekly Receipts captured Sanchez's

attendance, *id.* 297 (Montoya), and Sanchez personally signed the receipts, *id.* 317 (Montoya).

Furthermore, Gonzalez corroborated Montoya's account of the preparation of the receipts and

---

had "no reason to believe that they won't show up for work, because they're full-time
employees, the ones that sign [the receipts]." *Id.* 500 (Uffer). But Gonzalez testified that
employees who worked on Saturdays signed their receipts either with her that Saturday or with
Montoya the Friday before or the following Monday. *Id.* 555–56 (Gonzalez); *id.* 556–57
("Sometimes they probably did it with her. She probably let them sign. I let them sign if it
wasn't signed on Saturday."). Accordingly, if Sanchez worked on Saturdays, as the parties agree
he did, *see infra* section IV, and signed his receipt on Saturday at least two times, it would have
been impossible for Montoya to have been present every time he signed his weekly receipt.

Nonetheless, given the conflicting accounts as to whether Sanchez ever signed his receipt on a
Saturday, the two years that elapsed between the events at issue and the trial, and Montoya's
overall credibility, the Court attributes Montoya's testimony on this detail to be a failure of
recollection, and credits in full the central point in her testimony—that the Weekly Receipts are
an accurate record of Sanchez's hours and wages, and that Sanchez vouched for this by signing
these receipts each week.

[8] For example, when the Court asked about how the receipts accounted for lunch breaks, she
agreed that, if an employee's 40 hours of work included daily one-hour lunch breaks, he worked
only 35 hours. Tr. 297 (Montoya). She stated that she "didn't think about" whether the 40 hours
notated on the Weekly Receipts included lunch breaks, and instead "just wrote down" 40 hours
based on the five weekdays in a week. *Id.* 296 (Montoya). Likewise, she testified that she did
not remember why certain receipts indicated that Sanchez worked 46 hours and earned more than
$800. *Id.* 304–06 (Montoya). She testified that she simply extracted the payment amount from
the number written on the envelopes. *Id.* 305–06 (Montoya).

payment of workers.  She testified that she, too, personally witnessed Sanchez sign the Weekly

Receipts every week.  *Id.* 553, 560 (Gonzalez).

Other evidence produced at trial, as well as certain features of the Weekly Receipts,

further support the finding that the receipts are authentic, created in real time and not for

purposes of this litigation, and reliably record Sanchez's hours and wages.

First, the payment amounts provided—$800 for most weeks, and $1,000 for weeks in

which Sanchez worked more than 40 hours—are consistent with both Sanchez's and defendants'

testimony as to his regular rate of $800 per week, as well as defendants' testimony as to his $200

earnings on Saturdays.  *See id.* 57–58, 126 (Sanchez, stating he was paid $150 per day and $50

for meals); *id.* 553–54 (Gonzalez); *id.* 454, 502 (Uffer).  Likewise, the entry for the week of May

18, 2020, which states that Sanchez worked 12 hours and was injured that week, accords with

Sanchez's testimony and workers' compensation claim about the injury that he sustained on May

19, 2020 and his ensuing absence from work.  *See id.* 43, 60 (Sanchez); Defs. Ex. 3.

Second, the receipts contain apparent typos.  These include: the amount received on

February 8, 2020, which contains a mark that could be interpreted as a "1" or a comma, such that

the figure could be read as either "1,00.00" or "1100.00"; the date range in the week of February

10, 2020, which includes a Sunday; and the descriptions of payment for the weeks of May 18,

May 25, June 1, June 8, June 15, and June 22, 2020, which alternatively say "injured paid" or

"injured pay."  *See* Weekly Receipts at 1–2, 6–8.  Such typos, including on the receipt for the

first week that Sanchez purportedly worked overtime, would be improbable if, as Sanchez seems

to argue, the receipts were created after this lawsuit was filed and not in the regular course of business.[9]

Sanchez's assertion that he did not sign the receipts is particularly unworthy of belief. Tr. 69–70 (Sanchez). Both Gonzalez and Montoya testified that Sanchez personally signed the Weekly Receipts. *Id.* 553, 560 (Gonzalez); *id.* 317 (Montoya). Sanchez's representation that he did not sign the receipts, if credited, would mean that Gonzalez and Montoya lied on the stand and defendants forged or otherwise fabricated the Weekly Receipts. Sanchez has not provided any support for this accusation. The Court recognizes that, in this litigation, defendants have a monetary incentive to marshal evidence supporting their position. The record also suggests that defendants have strained personal relations with Julio Baez, who—to an extent and in a manner that the evidence did not make optimally clear—is at least professionally affiliated with Sanchez. *See, e.g., id.* 138 (Sanchez); *id.* 510–11 (Gonzalez). But the evidence elicited at trial, and the Court's assessment of the content of the witnesses' testimony and their demeanor in testifying, did not come close to supporting that defense witnesses fabricated this documentary evidence. Nor does the record, while supplying some evidence of pretrial missteps by both sides, *see infra* section VIII, evince the bad faith or ill will on the part of defendants toward Sanchez that would warrant finding that they fabricated all or part of the Weekly Receipts. The parties' testimony, in fact, indicates the opposite, to wit, defendants' solicitude and affection for Sanchez, at least for the period that Sanchez was employed by EIG: Defendants lent Sanchez up to $800 without expecting him to repay them, *see id.* 71 (Sanchez); *id.* 558–59 (Gonzalez), and paid him his full

---

[9] Although the Court does not rely on this representation about records not introduced into evidence, defense counsel represented, in response to a question in closing argument, that similar receipts exist for other EIG employees. Closings 62. Such would tend to corroborate that Sanchez's Weekly Receipts are a contemporaneous record of his hours and wages at EIG.

salary while he was injured, *see id.* 559 (Gonzalez) (defendants paid Sanchez while he was injured because he "deserved it" and "needed to pay rent"); *id.* 454 (Uffer) ("[Sanchez], like I said the other day, I care about him.").

Notably, too, Sanchez was on notice that his claims were apt to turn in part on whether the Court credited the Weekly Receipts, including his signature on them, as authentic. He elected, however, not to retain a handwriting expert to potentially substantiate his claim that there were consequential inconsistencies between the signatures attributed to him on the Weekly Receipts and his signatures on documents that he admitted signing, including the workers' compensation claim, and that such bespoke forgery of his signatures on the Weekly Receipts. He relied instead on his own testimony on this point, in which he stated that when he provides his signature, "normally I just write down my name, and on top of it, I draw several lines." *Id.* 65 (Sanchez) (discussing workers' compensation claim). By contrast, he stated, the signature on the Weekly Receipts "has my name more separately, and there is only one line and one circle." *Id.* 70 (Sanchez). That testimony does not, at all, establish forgery of these signatures. After careful review of the documents, the Court finds any differences across Sanchez's signatures subtle at best. The unusual features of Sanchez's signature appear across all such documents. And the dominant characteristics of each signature—the inclusion of only the words "Jose Luis," the wide spaces between the letters, and the multiple, curled lines across his name—are the same across the Weekly Receipts and other documents containing Sanchez's signature. Considering the evidence as a whole, the Court finds that the Weekly Receipts contain Sanchez's signature.

In sum, based on the highly credible testimony of Montoya, as corroborated by other evidence produced at trial, the Court finds that (1) EIG recorded Sanchez's hours worked and wages paid in the Weekly Receipts, and (2) Sanchez signed the receipts on a weekly basis.

Sanchez does not directly challenge the contents of the Weekly Receipts, including the accuracy of the total hours or wages recorded, the process by which Montoya completed the pay receipts, and his understanding of the receipts when he signed them.[10] Accordingly, the Court credits the Weekly Receipts as a reliable record of the hours that Sanchez worked and the wages that he received from EIG between January 20 to July 31, 2020.

### III.   Dates of Employment

The parties dispute the dates that Sanchez worked for EIG.  Sanchez claims that he worked for EIG from some point in summer 2017 to some point in fall 2020, and that he did so on a regular and/or full-time basis. *See* JPTO at 4; Dkt. 75 ("Pl. Findings") ¶ 11; Tr. 42 (Sanchez).  Defendants state that, in fact, Sanchez worked for EIG on a full-time basis only between January 20 and July 31, 2020; Sanchez, they state, returned to work for EIG briefly after July 2020, and thereafter stopped working for EIG. *See* Dkt. 78 ("Defs. Findings") ¶ 1; Tr. 550, 580–81 (Gonzalez); *id.* 496 (Uffer); *see also id.* 514–18, 529–30, 537–38 (Gonzalez) (not mentioning Sanchez when listing employees in 2017, 2018, and 2019); *id.* 401, 407–08, 411, 417–21, 493 (Uffer) (not mentioning Sanchez when listing employees in 2017 and 2018, and stating Sanchez did not work full-time in 2019).  According to defendants, any work that Sanchez performed for EIG before 2020 was either (1) part-time or "spot work," such as torch work and cleaning, when a full-time employee was sick or EIG was especially busy, *see* Tr. 540–44, 632 (Gonzalez), or (2) jobs preparing and loading containers for exporters, over the course of

---

[10] Sanchez does not assign significance to the shift in format of the receipts across the first and second batches of receipts.  Montoya did not have a specific recollection for this, testifying that "[t]he other copies must have ran out." Tr. 302 (Montoya).  Notwithstanding this shift, the Court finds that both sets of receipts were completed through the process to which Montoya testified.

what Gonzalez estimated to be 10–20 exporting jobs in 2019, *see id.* 531–32, 611–12, 634–35 (Gonzalez). *See id.* 417–21, 493 (Uffer).

Because Sanchez's dates of employment implicate the nature of his employment—that is, whether he worked on a full-time or part-time basis—the Court here makes findings of fact as to both issues. For the following reasons, the Court generally credits defendants' testimony, and does not credit Sanchez's contrary testimony. The Court thus finds that Sanchez worked for EIG on a full-time basis only between January 20 and July 31, 2020.

First, the Weekly Receipts, the sole documentary evidence speaking to this issue, corroborate defendants' account of Sanchez's employment. They reflect his receipt of weekly wages for 40 or more hours of work during the period January through July 2020 and not before or after. Defendants credibly testified that, as to Sanchez's pre-2020 spot (non-full-time) work, EIG did not create receipts for his signature. *See id.* 640–41 (Gonzalez); *see also id.* 500 (Uffer) (only full-time employee signed receipts).

Second, aside from Sanchez, every EIG-affiliated witness—including, importantly, non-party percipient witnesses such as Montoya and EIG employee Patrick Rattray—testified that Sanchez started working for EIG as a full-time employee in January 2020. *See, e.g., id.* 550 (Gonzalez); *id.* 496 (Uffer); *id.* 307, 311 (Montoya); *id.* 390 (Rattray).[11] It is reasonable that these witnesses remembered Sanchez's start date given EIG's small size. By all accounts, EIG employed no more than five or six employees during the period at issue. Both Montoya and

---

[11] EIG employees Luis Baez and Edward Calvert also identified January 2020 as Sanchez's first month as a full-time employee at EIG. *See* Tr. 225–26 (Baez); *id.* 216–17 (Calvert). In addition, Bernard Jones stated that he personally asked Gonzalez and Uffer to hire Sanchez in early 2020. *See id.* 332–34 (Jones). However, as discussed below, *see infra* section VIII, the Court, for reasons particular to these three witnesses, accords little weight to their testimony or declarations and only partially credits Rattray's testimony.

Rattray explained why they recalled Sanchez's start date: Rattray remembered that Sanchez had replaced Rattray's cousin, Sammy, who did torch work for EIG, and Montoya remembered being told that a new employee would start in January 2020 and attending a going-away party for Sammy.[12] *See id.* 307, 311 (Montoya); *id.* 390–94 (Rattray). Gonzalez likewise testified that she hired Sanchez after Sammy left New York in December 2019, and after Sanchez asked Gonzalez for full-time work. *Id.* 551 (Gonzalez).

Third, evidence that EIG paid other individuals, such as Bernard Jones, to perform spot work, *see id.* 423–24 (Uffer), and procured non-full-time workers to load containers for exporters in EIG's yard, *see, e.g., id.* 391–92 (Rattray), reinforces the plausibility of defendants' representation that, on the occasions that Sanchez worked for EIG before 2020, he did so either on a part-time basis or for the purpose of loading containers for exporters. Given that exporter-related work took place mostly on Saturdays, *see id.* 124, 128 (Sanchez), it is reasonable to find that he performed such work for EIG before working there full-time, as such timing was consistent with his simultaneously holding another job.

Fourth, Sanchez's representation that he began working for EIG in 2017 is largely unsupported by other evidence and in conflict with aspects of his own testimony. Sanchez testified that he worked for Marbo until it closed in July 2017, took three weeks off, and then worked for Alpha Recycling for six months. *Id.* 112–13, 116 (Sanchez). Accordingly, by his own account, it would have been impossible for him to have worked on a full-time basis for EIG in 2017. Indeed, Gonzalez testified that EIG did not have any employees in 2017 because

---

[12] Montoya testified in her pretrial deposition that she did not remember whether Sanchez replaced anyone at EIG. When confronted with this statement at trial, she credibly testified that, at some point after the deposition, she had seen Sammy, which triggered her memory that Sanchez had replaced Sammy. Tr. 316–17 (Montoya).

defendants were focused on obtaining licenses. *See id.* 511–14 (Gonzalez). Sanchez's self-serving testimony that he began working for EIG in 2017 is essentially uncorroborated.[13]

More generally, Sanchez's position as to his dates of employment has varied over the course of this case: In the Amended Complaint, he alleged that he worked at EIG through November 2020. AC ¶ 10. In his proposed findings of fact, he stated that he worked at EIG from July 6, 2017 to October 15, 2020. Pl. Findings ¶ 11; *see also* JPTO at 4 (asserting that he worked for EIG from July 2017 to November 2020). And at trial, he initially testified that he worked for EIG from June 2017 through the end of September 2020, Tr. 45 (Sanchez), and later testified that he worked for EIG from July 7 or 8, 2017 through October 9, 2020, *id.* 140–41 (Sanchez). Sanchez also admitted at trial that his workers' compensation claim, which he filed before the commencement of this lawsuit, contained an inaccurate start date: July 8, 2015, well before EIG was founded.[14] *See* Defs. Ex. 3; Tr. 63 (Sanchez). These inconsistencies call into question the overall reliability of his testimony on this critical issue.

Sanchez produced three sets of Facebook Messenger exchanges—between him and Gonzalez, him and Luis Baez, and him and a friend, Jorge Enrique Urquizo Deza—purporting to demonstrate that he regularly worked for EIG before 2020. *See* Pl. Exs. C, N, O, Q.[15] As noted

---

[13] Daniel Parella, who owns a towing company that does business with EIG, stated that he "probably" started seeing Sanchez working at EIG within the first year of EIG's operation. Tr. 269 (Parella). That Parella saw Sanchez at EIG at some point in its first year, however, does not establish that Sanchez then worked for EIG on a full-time basis. Parella admitted that he was not "really positive" of the dates. *Id.*

[14] Sanchez testified that his attorney prepared the workers' compensation claim, and that he did not tell the attorney his hire date. *See* Tr. 135–38 (Sanchez). He also testified, however, that he reviewed the claim before he signed it. *Id.* 138 (Sanchez).

[15] Unless otherwise noted, the Court received both the original Spanish and translated English versions of the messages. Tr. 109–10. The Court received the statements by Jorge Enrique Urquizo Deza, who was not a party to this case, only for the fact that the statements were made and to contextualize Sanchez's messages. *Id.* 103.

17

below, *see infra* section VIII, the Court is troubled by defendants' discovery lapses in connection with Gonzalez's messages with Sanchez. Nevertheless, the Court concludes that the messages that Sanchez produced fall well short of establishing that he worked full-time for EIG before 2020. These instead are largely consistent with defendants' account that, before 2020, Sanchez performed only part-time work and exporter-related jobs for EIG.

As to the messages between Gonzalez and Sanchez, certain exchanges indicate that Sanchez worked for EIG with some regularity before 2020, especially in 2019. *See, e.g.*, Pl. Ex. Q at 78 (Gonzalez telling Sanchez he had eight-hour work day); Pl. Ex. Q at 75–76 (Gonzalez asking Sanchez to stop by EIG office); *see also* Tr. 81–95 (Sanchez) (discussing 2018 and 2019 messages regarding Sanchez's ability to perform work, co-workers, payment, and vacation days). But, considered as a whole, the messages do not establish that Sanchez worked for EIG on a full-time basis during those years. Sanchez and Gonzalez did not exchange any messages for nearly seven months in 2018, despite Facebook being their only means of communication. *See* Tr. 529–31, 542 (Gonzalez); Pl. Ex. Q at 73–75. And many pre-2020 messages include references to exporter work. *See, e.g.*, Pl. Ex. Q at 85–86 (mentioning container); *id.* at 93 (mentioning exporter); *see also* Tr. 565–66, 622–24 (Gonzalez). Gonzalez also explained, credibly, that Sanchez's pre-2020 messages regarding work attendance and vacation days related to her schedule for exporter work or spot work, rather than to any full-time employment. *See* Tr. 622–29, 631, 634–37 (Gonzalez).

The messages between Sanchez and Luis Baez and between Sanchez and Deza similarly do not provide a sufficient basis on which to find that Sanchez worked on a full-time basis for EIG before 2020. Sanchez's messages with Luis Baez are sporadic and difficult to parse, but

they do not indicate at all that Sanchez worked on a day-to-day basis for EIG in 2018 and 2019.[16]

Sanchez's messages with Deza, who did not testify, are different: in these Sanchez discusses

working in 2018 and 2019 for individuals whom the Court takes to be defendants (referenced as

"Ricchi" and "Monica"), referencing the number of workers working with him, the possibility of

a raise, and his interest in searching for another job. *See* Pl. Ex. N at 5–32; *see also* Tr. 104–05

(Sanchez). Deza, however, did not testify, and the exchanges with him are sparse and vague.

Even considered alongside Sanchez's testimony, these do not meet Sanchez's burden to prove by

a preponderance of the evidence that he began working for EIG on a full-time basis at some

point before 2020.

Based on the above, the Court finds that:

(1) In 2017, Sanchez did not work for EIG.

(2) In 2018 and 2019, Sanchez performed part-time work and exporter-related jobs for EIG.

(3) Between January 20 and July 31, 2020, Sanchez was a full-time employee of EIG.

(4) Between the end of July 2020 and the end of October 2020, Sanchez performed part-time or exporter-related work for EIG, after which he stopped working at EIG.

## IV.   Hours Worked

The parties dispute the hours that Sanchez worked for EIG. They agree that he worked

for EIG on Mondays through Fridays, and sometimes on Saturdays, in 2020. JPTO at 6. They

further agree that Sanchez received a one-hour lunch break and mid-morning coffee break every

day. *Id.*; Pl. Findings ¶ 19; Tr. 144 (Sanchez); Defs. Findings ¶ 11; Tr. 554 (Gonzalez).

---

[16] Luis Baez initially denied having exchanged any Facebook messages with Sanchez. *See* Tr. 238–43 (Baez). That such messages were produced at trial reinforces the Court's assessment that Luis Baez's testimony, in general, was difficult to credit and merited little weight.

Sanchez testified that he worked more than 40 hours every week, as follows: In 2017, he worked on weekdays from 7 a.m. to 5 p.m., and stayed past 5 p.m. around four days a week, and he worked up to three Saturdays per month, also from 7 a.m. to 5 p.m. Tr. 49–51 (Sanchez). In 2018, he worked on weekdays from 7 a.m. to 5 p.m. or later, until 7 p.m. or 8 p.m., and he worked three to four Saturdays per month, also from 7 a.m. to 5 p.m. *Id.* 52 (Sanchez); *see also id.* 117 (Sanchez). In 2019, he "[r]egularly" worked on weekdays from 7 a.m. until 7 p.m. or 8 p.m., and he worked approximately three Saturdays a month, from 7 a.m. to 5 p.m. *Id.* 54–55 (Sanchez). In 2020, he worked on weekdays from 7 a.m. until 5 p.m. or later, until 7 p.m. or 8 p.m., and he "sometimes" worked three Saturdays a month. *Id.* 57–58 (Sanchez); *see also id.* 119 (Sanchez). He testified that he arrived to work every day at 6:30 a.m. in order to change his clothes. *Id.* 119 (Sanchez). He did not keep a record of his overtime hours at any point while he worked for EIG. *Id.* 147–48 (Sanchez).

Defendants did not specify how many hours Sanchez worked part-time for EIG in 2018 and 2019, but they maintained that he did not work more than 40 hours any given week. As for 2020, defendants contend that Sanchez worked on weekdays from 9 a.m. to 5 p.m. and, on some Saturdays, from 9 a.m. to 2 or 3 p.m. *See* Defs. Findings ¶ 9; Tr. 552, 554 (Gonzalez). Uffer, who was present at EIG on a daily basis starting around March 2020, testified that Sanchez arrived at work around 8:30 a.m. or earlier, but only began working at 9 a.m. Tr. 498–99 (Uffer). Gonzalez, who handled day-to-day operations at EIG from January through some point in March 2020, likewise testified that Sanchez worked between only 9 a.m. to 5 p.m. *Id.* 552, 575 (Gonzalez). Defendants testified that, on weekdays, EIG's employees typically stopped their dismantling work by 4 p.m. in order to clean up the yard and drain car fluids, and that the employees left by 5 or 5:15 p.m. *Id.* 548 (Gonzalez); *id.* 463 (Uffer).

Because Sanchez does not bring any claims as to his compensation for non-overtime work, the Court makes findings of fact only as to whether Sanchez worked more than 40 hours a week. As for Sanchez's hours in 2017, 2018, and 2019, it follows from the Court's finding that Sanchez worked on a full-time basis for EIG only in 2020 that he likely did not work more than 40 hours a week for EIG in the years before 2020. Although it is theoretically possible that a worker could spend more than 40 hours a week on part-time or exporter-related jobs, Sanchez has not produced any evidence, aside from his own suspect testimony, that he did so before 2020. Thus, the Court finds that Sanchez did not work more than 40 hours a week for EIG in 2017, 2018, or 2019. As for Sanchez's hours between January 20 and July 31, 2020, the Court finds that, excluding weeks in which Sanchez was injured, sick, or otherwise absent from work, Sanchez worked on weekdays from 9 a.m. to 5 p.m. and occasionally worked on Saturdays from 9 a.m. to 2 or 3 p.m., such that he worked between 40 to 46 hours, including his one-hour lunch breaks, each week. Finally, as for Sanchez's hours between the end of July 2020 and the end of October 2020, the Court finds that Sanchez did not work more than 40 hours a week during that period; aside from Sanchez's own testimony, there is no evidence otherwise. The Court relies on the Weekly Receipts as the best—and reliable—evidence of his total hours at EIG, including his one-hour lunch breaks, for the weeks between January 20 and July 31, 2020.

In sum, the Court largely credits defendants' testimony as to Sanchez's hours, for the following reasons.

First, as with Sanchez's dates of employment, the Weekly Receipts corroborate defendants' account of Sanchez's hours worked. The receipts indicate that, of the 18 weeks in which Sanchez worked five or more days, he worked 40 hours each week in 13 weeks and 46 hours each week in five weeks. *See* Weekly Receipts. Assuming that these totals include lunch

breaks, these figures correspond with defendants' representation that Sanchez worked eight hours a day for five days a week in most weeks and an additional five or six hours in weeks where he worked Saturdays, including Sanchez's daily one-hour lunch breaks.

Second, two non-party witnesses who worked at EIG in 2020 testified that employees worked from 9 a.m. to 5 p.m. on weekdays, with employees performing additional work for EIG or exporters on one to three Saturdays per month. *See, e.g.*, Tr. 296, 301–02 (Montoya); *id.* 373–74 (Rattray).[17]  Montoya's testimony was again credible and more specific than that of other witnesses on this point:  She testified that EIG stopped receiving cars each day at 3 p.m., the workers stopped cutting cars at 3:30 p.m., and the workers changed out of their work clothes around 4:30 p.m. *Id.* 301–02 (Montoya).  At 5 p.m., she stated, "[a]ll the workers" left together and the gate would then be locked. *Id.* (Montoya).  She could not speak to Sanchez's Saturday work because she worked only one Saturday while at EIG. *Id.* 308 (Montoya).

Third, testimony by non-party witnesses who did business with EIG supports defendants' account that employees like Sanchez worked between 9 a.m. to 5 p.m. on weekdays.  The Court does not accord significant weight to these witnesses' testimony, as some of them have ongoing business relationships with EIG and none of them could describe Sanchez's hours in particular.  Still, their testimony reinforces defendants' account of Sanchez's working hours.  For instance, Francisco Portes, who owned a tire shop that purchased tires from EIG, stated that EIG was open on weekdays from 9 a.m. to 5 p.m., and that he had found EIG's yard closed when he came to

---

[17] Calvert also stated that, as a full-time EIG employee, he worked from 9 a.m. to 5 p.m. each day, and that the employees cleaned up the worksite starting around 4 or 4:15 p.m. each day. *See* Tr. 200, 217–19 (Calvert). Likewise, Jones, who helped out at EIG occasionally, stated that EIG's employees generally work from 9 a.m. to 5 p.m. and "never worked overtime." *Id.* 331, 334, 355 (Jones).  However, given serious questions about Calvert's credibility, *see infra* section VIII, and the fact that Jones could not speak to Sanchez's hours in particular, the Court does not rely upon this testimony in making its findings of fact.

pick up tires before 9 a.m. on a weekday and on at least one Saturday. *Id.* 153–56, 165–71 (Portes). Wilkin Suero Alcantara, an exporter who worked with EIG, stated that EIG was closed on weekdays before 9 a.m. and that he believed, based on representations by Gonzalez, that EIG was closed on weekdays after 5 p.m. and on Saturdays. *Id.* 179–80, 183–84 (Alcantara). Daniel Parella, who owns a towing company across the street from EIG, also testified that he would see Sanchez at EIG around "8:30ish" on weekdays and that, in 2020, EIG was open between 9 a.m. to 5 p.m. on weekdays. *Id.* 260–62, 267, 278–79 (Parella). He stated that EIG's employees, including Sanchez, "[p]robably" left EIG each day around 5:15 p.m., after they were dressed, because "[n]othing comes in after 5:00." *Id.* 285 (Parella). He stated that EIG closed its yard during inclement weather. *Id.* 267–68 (Parella).

Fourth, defendants credibly testified that Sanchez could not have conducted his work, which involved operating a torch, after sundown. They described EIG's yard as 100 feet by 100 feet, with the torch station located across from the entrance. *See id.* 402–03 (Uffer); *id.* 544–46 (Gonzalez). They stated that, although certain parts of the yard, including the entrance, had lighting, the area near the gas-operated torch station did not have any electrical outlets—and thus no lighting. This made it "dangerous," and in practice impossible, for a worker to operate the torch when it was dark outside. *Id.* 460–62 (Uffer); *id.* 547, 549 (Gonzalez). Defendants did not produce photos of the yard, which would have assisted the Court in evaluating these claims. But Sanchez did not, save through his own testimony, adduce evidence rebutting this testimony. The Court finds defendants' testimony about the lighting in the yard credible and that it undermines Sanchez's assertion that he regularly worked past 5 p.m.

Fifth, Sanchez's representations of his hours have been inconsistent. For instance, he stated in his deposition that he worked every Saturday; he admitted at trial that that statement

was inaccurate. *Id.* 106 (Sanchez). At trial, when naming his co-workers and describing their schedules, he first stated that only one co-worker, Rattray, worked the same hours as him, and later stated that other co-workers did as well. *Id.* 117–18 (Sanchez). Similarly, he originally testified that he did not take breaks or vacations during his time as an EIG employee, *id.* 43 (Sanchez), only to state later that Gonzalez agreed to pay him for one week's vacation, *id.* 86 (Sanchez). These inconsistencies, albeit modest, call into question the broader reliability of his testimony as to his hours of employment.

Three pieces of evidence lend a degree of support to Sanchez's account: online postings of EIG's hours, his workers' compensation claim, and his messages with Deza. Yet even when considered as a whole, this evidence does not enable Sanchez to carry his burden of proof as to his hours worked.

The online postings of EIG's hours, including on EIG's Facebook page and a web search page, state that EIG operated outside the hours of 9 a.m. to 5 p.m. on weekdays. *See* Pl. Exs. D, E. These postings do not, however, necessarily reflect Sanchez's hours in 2020. As an initial matter, the postings recite differing hours; the record leaves unclear which the Court should credit as accurate. *Compare* Pl. Ex. E (Facebook page, listing hours as weekdays from 8 a.m. to 6 p.m.), *with* Pl. Ex. D (web page, listing hours as weekdays from 7 a.m. to 5 p.m., and Saturdays from 8 a.m. to 3 p.m.). There is also no evidence suggesting that these postings, which were extracted after this lawsuit was filed in 2021, reflect the working hours of EIG's employees in 2020. *See* Tr. 643 (Gonzalez) (stating that she listed hours on Facebook in 2017 and updated them after 2020), 654 (Gonzalez) (stating that she did not list hours on web page). Further, defendants provided a credible explanation for the difference between the public-facing hours on the postings and the hours they claim Sanchez worked: Because EIG largely relies on scheduled

24

vehicle drop-offs, defendants stated, they had an incentive to invite phone calls regarding these drop-offs during as many hours of the day as possible, including hours when yard employees like Sanchez were not working. *See id.* 646–47, 651–52 (Gonzalez); *id.* 484–86 (Uffer). Montoya's testimony reinforces this explanation. She stated that she forwarded calls from EIG's phone line to Gonzalez or Uffer's phones when she left the office and transferred the calls back to EIG's phone line when she arrived at the office. *Id.* 290 (Montoya); *see also id.* 534 (Gonzalez). Sanchez has not provided any contrary evidence. The Court thus accords little weight to the postings in determining Sanchez's hours.

Sanchez's workers' compensation claim, which states that he was injured on May 19, 2020 at 5:30 p.m. at his "usual work location," is consistent with his assertion that he worked past 5 p.m., at least on the day of the accident. *See* Defs. Ex. 3. But because the parties disagree as to the time the accident took place, Sanchez's account in his workers' compensation claim is not dispositive on this point.[18] Sanchez testified that he was injured at 5:30 p.m., Tr. 43, 60 (Sanchez); Uffer stated that the accident took place during the lunch hour, *id.* 426, 452 (Uffer). And Sanchez's workers' compensation claim form contains a major undisputed inaccuracy (the date that EIG hired Sanchez), and the form was completed by Sanchez's attorney, rather than Sanchez himself. *See* Defs. Ex. 3; Tr. 135–38 (Sanchez). Further undermining the accident time reflected on the workers' compensation claim, the Weekly Receipts state that Sanchez worked 12 hours during the week of May 18, 2020. Weekly Receipts at 6. This 12-hour figure more closely aligns with Uffer's testimony that Sanchez was injured during the lunch hour, Tr. 452

---

[18] Relatedly, the parties also disagree about whether Sanchez incurred the injury while performing work for EIG. *Compare* Tr. 60 (Sanchez) (stating he was injured while working for EIG), *with id.* 425–26, 452 (Uffer) (stating Sanchez was injured while either loading container or placing motor in pick-up truck, neither of which was a function Sanchez performed for EIG).

(Uffer), and thus had worked for approximately four hours before being injured. In light of this mixed evidence, the Court finds that the 5:30 p.m. injury time on Sanchez's workers' compensation claim merits very limited weight in determining Sanchez's hours worked.

Finally, in his messages with Deza, Sanchez said that he worked for 55 to 60 hours for five days a week while employed by Gonzalez. Pl. Ex. N at 53; *see also id.* at 34 (stating he worked from 7 a.m. to 5 p.m. and sometimes left work at 6 p.m.). But, as noted with respect to Sanchez's messages to Deza regarding his employment dates, the Court cannot find these messages dispositive on the issue of Sanchez's hours, given that Deza did not testify and given the lack of clarity as to what, concretely, the two were discussing in these messages.

Accordingly, the Court credits defendants' account of Sanchez's hours and finds that:

(1) Before 2020, Sanchez did not work more than 40 hours a week for EIG.

(2) Between January 20 and July 31, 2020, except for weeks in which he was injured, sick, or otherwise absent from work, Sanchez worked on weekdays from 9 a.m. to 5 p.m. and on occasional Saturdays from 9 a.m. to 2 or 3 p.m., for a total of 40 to 46 hours each week, including one-hour lunch breaks. In the absence of records as to the precise days and times Sanchez worked each week, the Court relies on the Weekly Receipts as the best, and reliable, record of his exact hours at EIG during this period.

(3) Between the end of July 2020 and the end of October 2020, Sanchez did not work more than 40 hours a week for EIG.

## V.    Payment

### A.    Payment Practices

Because Sanchez challenges his compensation for overtime, and not regular time, work, and because the Court finds that Sanchez worked overtime only between January 20, 2020 and July 31, 2020, the Court makes findings of fact as to his payment during only that period.[19]

---

[19] The Court thus has no occasion to consider the parties' testimony as to EIG's weekday and Saturday payment rates in 2017, 2018, and 2019 or Sanchez's testimony about his requests for overtime pay in 2018 and 2019.

The Court finds that, in 2020, EIG paid Sanchez on a weekly basis, in cash, typically on Fridays.[20] *See* JPTO at 5; Tr. 58 (Sanchez); *id.* 538–39 (Gonzalez). Sanchez signed a receipt for his wages. *See* Weekly Receipts; *see also supra* section II. While Sanchez was out of work and recovering from his injury in May and June 2020, he continued to receive his weekly pay, either by Uffer hand-delivering his wages or Sanchez's friend picking up the wages on Sanchez's behalf. *See* Tr. 559 (Gonzalez); *id.* 454–55 (Uffer); *id.* 321–22 (Montoya). Sanchez signed the receipts for those weeks upon his return to EIG. *See id.* 323 (Montoya); *id.* 560 (Gonzalez).

### B.    Pay Rates and Wage Payments

By all accounts, Sanchez was paid $800 each week for his work on Mondays through Fridays in 2020.[21] *See id.* 57, 127 (Sanchez); *id.* 553 (Gonzalez); *id.* 454, 503 (Uffer). Sanchez testified that the $800 included $150 per day for his work, for a total of $750, and $50 for his meals over the course of the week. *See id.* 57, 127 (Sanchez). Gonzalez testified that the $800 was a lump-sum, weekly salary that did not include money for Sanchez's lunches, and that EIG provided lunch to its employees. *Id.* 538, 657 (Gonzalez); *see also* JPTO at 6. Neither party produced evidence substantiating their position. Because Sanchez's overtime claims fail for the reasons recounted below, the Court does not have occasion to resolve whether the $800 per week that Sanchez was paid reflects a daily or weekly wage rate.

---

[20] The record is unclear as to when Sanchez received his cash wages for weeks on which he worked on Saturdays: as a one-time payment for the full week, or in two payments, one for the weekdays and one for the Saturday. *See supra* note 7. These mechanics do not bear on the resolution of Sanchez's claims.

[21] The parties dispute whether EIG paid Sanchez for exporter-related work. Sanchez stated that Gonzalez paid him for such work. Tr. 124 (Sanchez). Gonzalez testified that the exporters paid for the work, but that she, at least once, offered to pay Sanchez what the exporter paid such that he would earn twice his pay. *Id.* 533, 637 (Gonzalez). Because this issue does not bear on the overtime claims here, the Court has no occasion to resolve this factual dispute.

The Court further finds that Sanchez was paid $200 for each Saturday that he worked in 2020. In testimony, the parties disputed Sanchez's Saturday rates: Sanchez testified that he earned $150 per Saturday, *id.* 58 (Sanchez); *see also* Pl. Findings ¶ 16, while Gonzalez and Uffer testified that he was paid $200 for Saturday work, Tr. 554–55 (Gonzalez); *id.* 502–03 (Uffer). The Weekly Receipts, bearing Sanchez's signature, support defendants' testimony: According to the receipts, for weeks in which Sanchez worked 40 hours, he received $800, and for weeks in which he worked 46 hours—presumably, because he worked six hours on the Saturdays—he was paid an additional $200, for a total of $1,000.[22] Moreover, Rattray testified that EIG's employees received $200 to $250 for Saturday work. *Id.* 388 (Rattray). Accordingly, the Court credits defendants' testimony, and finds that Sanchez received $200 for each Saturday that he worked. The Court credits Sanchez's testimony to the extent that he stated that EIG never formally designated any part of his payment as overtime payment. *See id.* 51, 53, 56 (Sanchez).

As with Sanchez's hours, the Court relies on the Weekly Receipts as a record of the exact wages he received each week at EIG between January 20 and July 31, 2020.

## VI.   Wage Notice and Wage Statements

### A.   Wage Notice

Defendants did not give Sanchez a notice, in English or in Spanish, upon his hiring or anytime thereafter, that contained, *inter alia*, the employer's name, address, and phone number; his rates of pay and basis of pay (for example, hourly, daily, weekly, salary, or other); and his regular pay day. JPTO at 6; Pl. Findings ¶¶ 10, 20; Tr. 46 (Sanchez).

---

[22] As noted above, the amount received on the receipt dated February 8, 2020, which states that Sanchez worked 46 hours, contains a mark that could be interpreted as a "1" or a comma, such that the figure could be read as "1100.00" or "1,00.00." Weekly Receipts at 1. Based on the receipts for the other four weeks reflecting 46 hours' pay, the Court concludes that this mark is a typo, and that the amount paid was $1,000.

**B.     Wage Statements**

The Weekly Receipts—the only form of documentation of EIG employees' pay, *see* Tr.

311 (Montoya); *supra* section II—did not contain, *inter alia*, EIG's full name, address, and

phone number; Sanchez's rate of pay and the basis of payment; and Sanchez's gross wages, any

deductions or allowances, and net wages.

**VII.   Defendants' Willfulness and Good Faith**

For the reasons set out below, the Court holds that defendants are not liable for violations

of the overtime provisions of the FLSA and NYLL.  Accordingly, the Court does not have

occasion to consider the willfulness of any violations, which would bear on the applicable statute

of limitations attributable to such violations.

The Court, however, does make findings of fact as to defendants' good faith compliance

with the FLSA and NYLL.  The Court finds that although EIG did not breach the overtime pay

provisions of those statutes, such did not result from good faith efforts to understand or comply

with these statutes, whose wage notice and wage statement provisions EIG breached.  The trial

record, in fact, was devoid of evidence that defendants ever undertook any meaningful effort to

ascertain any of their obligations under the FLSA and the NYLL.  Uffer testified that, after Julio

Baez and his business were sued for unpaid overtime, he had sought to avoid such liability on the

part of EIG.  *See* Tr. 479–81 (Uffer).  But Uffer did not offer specifics.  He was unable to explain

whether, to avoid liability, EIG had decided to bar employees from working overtime, as

opposed to pay them as required for overtime work.  He stated only: "The plan was I let

[Gonzalez] deal with it." *Id.* 481 (Uffer).  Gonzalez, for her part, stated that she understood

overtime laws to require that employees be paid time-and-a-half when they worked more than 40

hours a week.  *Id.* 656 (Gonzalez).  Yet she stated that she "honestly d[id]n't remember" whether

she ever made any calculations to ensure that Sanchez was properly compensated for overtime

work. *Id.* 660 (Gonzalez); *see also id.* 657–60 (Gonzalez).  She stated that if EIG's payment of Sanchez complied with labor laws, "[i]t would be a happy coincidence," and that "from my prior knowledge from New England, I'm pretty sure that it should." *Id.* 658 (Gonzalez).

The Court does credit defendants for maintaining some documentation of Sanchez's pay, in the form of the Weekly Receipts.  The evidence also indicates good will between defendants and Sanchez during the period before Sanchez stopped working at EIG.  The credible evidence was, for example, that Gonzalez lent Sanchez $800 to help him cover expenses, without any expectation that he would return the money and without a deduction from his weekly pay. *Id.* 71 (Sanchez); *id.* 558–59 (Gonzalez).  Defendants also paid Sanchez his regular weekly wages during the weeks he was injured. *Id.* 559 (Gonzalez) (defendants paid Sanchez while he was injured because he "deserved it" and "needed to pay rent"); *id.* 454 (Uffer) ("[Sanchez], like I said the other day, I care about him.").  Nonetheless, defendants' failure to calculate Sanchez's overtime rate, furnish him with a hire notice, document his part-time and exporter-related work, or research the laws at issue suggests a lack of good faith.  The absence of rudimentary diligence is particularly notable as the lawsuit against Julio Baez had put defendants on notice of, at a minimum, overtime laws.

## VIII.  Credibility

The Court paid close attention to the credibility of the trial witnesses.  The Court finds that defendants' witnesses were, on the whole, far more credible than Sanchez and his witnesses.

Credibility determinations can be of great importance in cases where, as here, there are conflicting accounts as to workplace practices and the authenticity of documents.  In this case, credibility determinations were complicated by language barriers.  Many witnesses testified in Spanish and their testimony was conveyed to the Court by an interpreter.  Thus, the Court, as factfinder, lacked direct access to some linguistic cues or nuances that can bear on a witness's

veracity. In some instances, answers to questions were non-responsive in a manner that strongly signaled to the Court that the thrust of a question had been, quite literally, lost in translation. Despite these limitations, some important observations relating to credibility could be made, and the Court was generally able to assess the credibility of the witnesses' claims against the other assembled evidence.

Starting with the party witnesses, the Court finds Uffer and Gonzalez, on the whole, more credible than Sanchez. Sanchez's testimony contained various inconsistencies, including with respect to his alleged 2017 start date at EIG, *see, e.g.*, *id.* 42, 45, 112–13, 116, 141 (Sanchez), how frequently he worked on Saturdays, *see id.* 106 (Sanchez), and whether he took a vacation while at EIG, *id.* 43, 86 (Sanchez),. Sanchez's testimony also notably lacked specificity, especially as to the inception of his employment at EIG, the distinctions between his cutting, clean-up, and exporter-related work for EIG, and the presence of signatures on the Weekly Receipts. Even accounting for the language barrier and the unfamiliarity of the courtroom setting, the Court is constrained to credit, where the parties' accounts differ, defendants' testimony over that of Sanchez. Defendants' testimony, while not devoid of inconsistencies, *see, e.g.*, *id.* 615 (Gonzalez), was generally more credible, as they provided clear, succinct, and largely consistent answers corroborated by other evidence.

To be sure, the Court was troubled by aspects of defendants' pretrial conduct: namely, (1) Gonzalez's deletion, at Uffer's encouragement, of several Facebook messages to Sanchez, (2) the apparent coaching of plaintiff's witnesses and EIG employees Luis Baez and Edward Calvert, and (3) the production of cookie-cutter declarations that defendants' declarants could not substantiate. Nevertheless, for the following reasons, the Court concludes that none of these issues warrants discrediting the testimony of Gonzalez and Uffer.

As to the deletion of the messages, Sanchez demonstrated that Gonzalez deleted messages pertaining to Sanchez's presence and hours of work at EIG in 2018 and 2019, and that she may have done so with a focus on deleting messages relevant to this case. *See, e.g., id.* 600–09 (Gonzalez); *compare* Pl. Ex. Q, *with* Pl. Ex. C.  But the Court credits Gonzalez and Uffer's testimony that she deleted the messages only to prevent non-party Julio Baez, a competitor with whom Gonzalez and Uffer are hostile and with whom Sanchez is today affiliated, from reviewing the messages, and not to conceal violations of the FLSA and the NYLL. *See* Tr. 526–27 (Gonzalez); *id.* 489–91 (Uffer).  Gonzalez ultimately produced the surviving original messages for the Court's review; and Sanchez could not identify any messages with Gonzalez that she had not retained so as to be unavailable to the Court at the time of trial. *See id.* 603 (plaintiff's counsel stating he has no examples of deleted messages that were not preserved). Because the messages at issue were preserved, their deletion by Gonzalez—though indicative of a cavalier attitude towards discovery obligations and the absence of firm guidance from defense counsel as to these obligations—is ultimately non-prejudicial.

As to the trial testimony of plaintiff's witnesses Luis Baez and Edward Calvert, the Court finds that they may have been cued to testify as to factual propositions assisting defendants, notwithstanding these witnesses' shaky (at best) recollection of these facts.  Neither witness could speak with assurance as to various facts and their testimony did not inspire confidence.[23] Yet both testified, with specificity, as to a critical issue: Sanchez's start date at EIG, which both identified as January 2020. *See id.* 225–26, 230 (Baez); *id.* 216–17 (Calvert).  The two

---

[23] Calvert oddly stated that he had understood questions in his deposition about "Jose" to refer to an exporter, rather than the plaintiff in this case. *See* Tr. 208, 214 (Calvert).  And Luis Baez could not explain why he remembered Sanchez's start dates, but not those of other co-workers. *Id.* 226 (Baez).  He also initially denied messaging with Sanchez, despite being confronted with Facebook messages he exchanged with Sanchez. *See id.* 238–43 (Baez).

witnesses' purported recall of this detail was striking, given their limited recall of other equally or more central facts. Such has led the Court to discredit their testimony entirely. However, such does not supply a basis to discredit Gonzalez and Uffer's testimony, on that or other points. And ultimately, it was the plaintiff, not the defense, who called Luis Baez and Calvert; defense counsel, although having listed these as defense witnesses in the Joint Pretrial Order, opted not to do so due to credibility concerns. *See id.* 252–54. The record also requires the Court to stop short of finding obstruction, intimidation, or coaching of these witnesses. Defense counsel denied engaging in such practices, *see id.* 252–56, 259, as did Gonzalez and Uffer, credibly. *See id.* 572–73 (Gonzalez); *id.* 456–57 (Uffer). Gonzalez and Uffer also credibly testified that they did not know how the witnesses came to know the defense's view as to Sanchez's start date. *See id.* 572–73 (Gonzalez); *id.* 459 (Uffer). It is plausible that undisciplined conversations within and around the EIG workplace, including with other employees, alerted Luis Baez and Calvert, who frequented EIG, to the salience of that date to this litigation, without any person's having acted with obstructive intent.

As to the declarations of certain defense witnesses (including Calvert, Jones, and Rattray) prepared on the watch of defendants' prior counsel, aspects of these were incredible. They contained near-identical language about Sanchez's daily work schedule, and many were signed on the same date. *See* Dkt. 117. Although English is not the primary language for many of the declarants, predecessor counsel—whom the Court directed to come to trial to account for these submissions—admitted that he did not translate the declarations for the declarants before their signing. *See* Tr. 440–50. And at trial, it was apparent that various declarants could not reliably vouch for certain statements in their declarations, including as to Sanchez's overtime hours and start date. *See, e.g., id.* 345–59 (Jones); *see also id.* 379–88 (Rattray). It emerged that

predecessor defense counsel had produced the declarations with reckless disregard for the witnesses' knowledge bases and testimonial capacities, with the intention to use these documents to help induce plaintiff's counsel to settle the case. The Court thus wholly discredits the declarations and condemns predecessor defense counsel for this sharp and unacceptable practice. At the same time, there is no indication that defendants played any role in creating the declarations or that this episode corrupted any other evidence in the case. Thus, there is little reason to discredit defendants' testimony on this basis.

As to the non-party witnesses, the Court does not credit the testimony of Luis Baez and Calvert, called by plaintiff, for the reasons stated. As for defendants' witnesses, the Court makes the following credibility determinations. The Court finds highly credible the testimony of Montoya, who left EIG more than two years before the trial and had no apparent motive to lie on the stand. She provided clear, responsive, and specific answers and admitted when she lacked the knowledge to provide an answer. *See supra* note 8. The Court partially credits the testimony of defendants' witnesses Jones and Rattray. Jones was evasive and inconsistent on the stand, especially with respect to the basis for his knowledge of EIG's payment practices and Sanchez's schedule. *See, e.g.*, Tr. 356–59 (Jones). He also testified that he is friends, or at least business associates, with Gonzalez, and that EIG pays him approximately $200 a week, which is "important" to his lifestyle. *See id.* 352–53, 364–65 (Jones). Rattray, a current EIG employee, was responsive, but his answers were at times unclear, including as to Sanchez's employment with EIG. *See, e.g., id.* 371–75, 380–89 (Rattray). The Court finds it warranted to accord only modest weight to this testimony. Finally, the Court finds credible, though only slightly probative, the testimony of non-EIG employees Portes, Alcantara, and Parella. Although all three witnesses currently conduct and/or have previously conducted business with EIG, their

demeanors and testimony on the stand did not indicate any bias or motive to obscure the truth for

defendants' benefit.

## CONCLUSIONS OF LAW

### I.   Jurisdiction

This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and the FLSA, 29

U.S.C. § 216, and supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C.

§ 1367(a).[24]

### II.   Enterprise Engaged in Interstate Commerce

The FLSA's overtime provisions apply if an employee "is engaged in commerce or in the

production of goods for commerce," or "is employed in an enterprise engaged in commerce or in

the production of goods for commerce."  29 U.S.C. § 207(a).  "The two categories are commonly

referred to as 'individual' and 'enterprise' coverage, respectively."  *Jacobs v. N.Y. Foundling*

*Hosp.*, 577 F.3d 93, 96 (2d Cir. 2009) (per curiam).  An "enterprise engaged in commerce" is an

enterprise that (1) "has employees handling, selling, or otherwise working on goods or materials

that have been moved in or produced for commerce" and (2) "whose annual gross volume of

sales made or business done is not less than $500,000."  29 U.S.C. § 203(s)(1).

The Court finds that EIG was an enterprise engaged in commerce for the purposes of the

FLSA during the years at issue in this case.  During this period, EIG grossed more than $500,000

per year, and its employees used tools and handled goods that had traveled or were produced in

interstate commerce.  *See* JPTO at 6; Pl. Findings ¶¶ 8–9.

---

[24] The Court rejected defendants' pre-trial motion that the Court lacked subject matter
jurisdiction to entertain Sanchez's state law claims, as those claims are related to his federal
claim and Sanchez adequately alleged an injury from the claimed NYLL violations.

### III.   Employer Status

The Court holds that Gonzalez and Uffer were employers of Sanchez subject to the FLSA and NYLL's requirements while he worked at EIG.

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  An individual may simultaneously have multiple "employers" for the purposes of the FLSA, and each employer is jointly and severally liable for all back wages and liquidated damages.  *Moon v. Kwon*, 248 F. Supp. 2d 201, 236–38 (S.D.N.Y. 2002).

"The Second Circuit has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Tapia v. Blch 3rd Ave LLC*, 906 F.3d 58, 61 (2d Cir. 2018) (citation omitted); *see, e.g.*, *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).  "[W]hether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (citation omitted).  "Above and beyond the plain language, moreover, the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact in the national economy.'" *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).  "The underlying inquiry in determining 'employer' status is whether the individual possessed operational control over employees." *Tapia*, 906 F.3d at 61; *see, e.g.*, *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013).  In determining whether a defendant is an employer under the FLSA, courts consider whether the individual: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'"

*Tapia*, 906 F.3d at 61 (quoting *Barfield*, 537 F.3d at 142; and citing *Carter*, 735 F.2d at 12); *see, e.g.*, *Ocampo v. Brown & Appel, LLC*, No. 21-2579, 2022 WL 17684587, at *1–2 (2d Cir. Dec. 15, 2022). "No one of the four factors standing alone is dispositive. Instead the 'economic reality' test encompasses the totality of circumstances." *RSR*, 172 F.3d at 139.[25]

The statutory definition of employer under the NYLL is similar to that of the FLSA. *Compare* 29 U.S.C. § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee."), *with* NYLL § 190(3) ("'Employer' includes any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service."). "Neither the New York Court of Appeals nor the Second Circuit has decided whether the tests for 'employer' status are the same under the FLSA and the NYLL. However, district courts in this Circuit have consistently interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA." *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015) (citations omitted); *see Irizarry*, 722 F.3d at 117. The parties do not argue otherwise, and the Court is aware of no case law to the contrary. The Court thus follows the weight of authority in this Circuit and applies the economic reality test to both statutes. *Cf., e.g.*, *Ocampo*, 2022 WL 17684587, at *1 n.1 (assuming without deciding that test for employer status is same under FLSA and NYLL); *Tapia*, 906 F.3d at 61 n.1 (same); *Hernandez v. Jrpac Inc.*, No. 14 Civ. 4176 (PAE), 2016 WL 3248493, at *22 (S.D.N.Y. June 9, 2016).

---

[25] In addition to the formal control test comprising the *Carter* factors, the Second Circuit has articulated a functional control test comprising other factors. *See Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71–72 (2d Cir. 2003); *Barfield v. N.Y.C. Health & Hosps. Corp.*, 432 F. Supp. 2d 390, 392–93 (S.D.N.Y. 2006), *aff'd*, 537 F.3d 132 (2d Cir. 2008).

Defendants do not dispute that they were Sanchez's employers.  And the totality of the circumstances supports that both individual defendants, along with EIG, were Sanchez's joint employers.  Gonzalez hired Sanchez, paid his wages, maintained the Weekly Receipts, and supervised him on a daily basis in at least January through some point in March 2020.  Uffer owned EIG and supervised him on a daily basis starting in March 2020.  Thus, the Court finds that Gonzalez and Uffer were employers subject to the FLSA and NYLL.

The Court further holds that Sanchez was EIG's employee, rather than an independent contractor, for the entire period at issue, including before 2020.  Defendants conceded that Sanchez served as an employee even while performing part-time work for EIG because he used EIG's tools and performed under defendants' direction.  *See* Closings 54–56; *see also Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74, 76, 79 (2d Cir. 2020) (outlining multi-factor tests to classify worker as employee or independent contractor under FLSA and NYLL).

## IV.    Overtime Wages

Both the FLSA and the NYLL provide that, for each hour an employee works in excess of 40 hours in a given work week, the employee must be paid at the rate of one-and-a-half times his regular hourly rate. 29 U.S.C. § 207(a); 12 N.Y.C.R.R. § 146-1.4; Pl. Findings ¶ 31; *see, e.g., Perry v. City of New York*, No. 21-2095, 2023 WL 5490572, at \*4 (2d Cir. Aug. 25, 2023).

An employee seeking to recover underpayment of wages "has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).  Where an employer fails to maintain adequate records of the employee's hours worked, wages earned, and other terms and conditions of employment, the employee is found to satisfy this burden if he can prove that he "in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.*; *see also Moon,*

248 F. Supp. 2d at 219 (citing *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997)). This burden is "not high" and may be met "through estimates based on [the employee's] own recollection." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011). "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687–88.

The Court here has found that the Weekly Receipts are an adequate, albeit sparse, record of Sanchez's hours and weekly wages between January 20 and July 31, 2020, and that defendants did not maintain any records of Sanchez's work for EIG during any other period.

As to Sanchez's work for EIG in 2017, 2018, 2019, and after July 31, 2020, the Court holds that Sanchez has not met his burden to prove, by just and reasonable inference, that he worked more than 40 hours a week at any point during these periods. He relies almost exclusively on his own testimony, which, for the reasons detailed above, is insufficient to establish that he worked overtime. Even if Sanchez met his burden, defendants produced ample evidence, including through the testimony of highly credible witnesses such as Montoya, negating any inference that he worked overtime during these periods. It follows that, because Sanchez did not work overtime, he was not entitled to overtime pay.

As to Sanchez's work for EIG between January 20 and July 31, 2020, the Court holds that defendants properly compensated Sanchez during this period, including for any overtime work he performed. The Court has found that, in 2020, Sanchez was paid $800 for 40 hours of work, including lunch breaks, from Mondays through Fridays, and $200 for up to 6 hours of work, including lunch breaks, on Saturdays. The Court has also credited the Weekly Receipts as an accurate record of the hours that Sanchez worked and wages he earned each week during this

period. The record left unclear whether the $800 pay included $50 for meals, and, relatedly, whether Sanchez's compensation excluded his one-hour lunch breaks, such that he was paid for only 35 hours on weekdays and 5 hours on Saturdays, for 40 hours total. But, however these numbers are construed, the Court finds, Sanchez was properly compensated.

The Court uses the weeks in which Sanchez is recorded as having worked the most hours—46 in total—as the basis for its calculations. If the $800 pay covered 40 hours of work, then Sanchez's regular rate was $20 per hour, and defendants were required to pay him for overtime work at a rate of $30 per hour. This would mean that all six of his hours on Saturday were to be compensated at that rate, for a total of $180. The $200 pay Sanchez received for his Saturday work exceeded that amount. If the $800 pay covered only 35 hours of work, and Sanchez was not being compensated for his lunch breaks, then Sanchez's regular hourly rate is approximately $22.86 per hour, making his overtime rate is approximately $34.29 per hour. But, in that scenario, Sanchez worked only five compensable hours on Saturday (as the one-hour lunch break must be subtracted). And, subtracting the five weekday lunch hours as non-compensable, Sanchez's five weekend hours brought his overall weekly hours only to 40, such that the five Saturday hours were required to be compensated at Sanchez's regular rate, for a total of approximately $114.29. This also falls well within the $200 pay he received for Saturday work. Even if, in this scenario, Sanchez worked six hours on Saturday (that is, without a lunch break), five of his hours were to be compensated at his regular rate and one hour at his overtime rate. He would thus be entitled to approximately $148.58, which would, again, be covered by his $200 Saturday pay.[26]

---

[26] Sanchez testified that he received $750, excluding $50 for meals, for his weekday work and $150 on Saturdays. Had the Court credited this testimony, Sanchez still would not have prevailed: If the $750 pay covered 35 hours of work, his regular rate would be approximately

Accordingly, the Court concludes that defendants properly compensated Sanchez for any overtime work.

## V.      Wage Notices and Statements

### A.      Wage Notice

New York labor law requires that, when an employee is hired, employers provide the employee a written notice that includes, *inter alia*: (1) "the rate or rates of pay and basis thereof"; (2) "allowances, if any, claimed as part of the minimum wage"; (3) the regular pay day; (4) the employer's name; (5) the physical address of the employer's main office or principal place of business; (6) the employer's phone number; and (7) "such other information as the commissioner deems material and necessary." NYLL, art. 6 § 195(1). The employer must obtain a signed and dated written acknowledgment of receipt of such notice. *Id.* An employee who does not receive a wage notice within 10 business days of his first day of employment may recover damages for each work day that the violation continued to occur, up to $5,000. *Id.* § 198(1-b).

As defendants concede, they did not provide Sanchez with the statutorily required wage notice. *See* Closings 56. They thus violated the NYLL's wage notice provision.

### B.      Wage Statements

The NYLL also requires that employers furnish each employee with a statement of every payment of wages, including, *inter alia*: (1) "the dates of work covered by that payment of wages"; (2) the employee's name; (3) the employer's name, address, and telephone number; (4) the "rate or rates of pay and basis thereof"; (5) the number of regular and overtime hours

---

$21.43 per hour, and his overtime rate would be approximately $32.14 per hour. This would mean that he was entitled to paid for only five hours on Saturday, which were to be compensated at his regular rate, for a total of approximately $107.14. That is below the $150 pay that Sanchez claims he received for Saturday work.

worked; (6) net wages; and (7) "allowances, if any, claimed as part of the minimum wage." NYLL, art. 6 § 195(3). An employee who does not receive wage statements may recover damages for each work day that the violation continued to occur, up to $5,000. *Id.* § 198(1-d).

As defendants also concede, they did not furnish the statutorily required wage statements, and the Weekly Receipts, the only documentation given to Sanchez, lacked certain required information. *See* Closings 56. Defendants thus violated the NYLL's wage statement provision.

## C.   Affirmative Defense

The Court finds, however, that defendants cannot be held liable for their violations of the wage notice and wage statement provisions. Both provisions permit employers to avoid liability if they prove either of two affirmative defenses: (1) that the employer "made complete and timely payment of all wages due"; or (2) that the employer "reasonably believed in good faith that it was not required" to provide the employee with the wage notice or statements. *See* NYLL, art. 6 §§ 198(1-b), (1-d). Here, defendants can avail themselves of the first (although not the second) defense. That is because, as reviewed above, the evidence establishes that defendants properly compensated Sanchez for his work at EIG, and Sanchez has failed to prove otherwise.[27] Accordingly, although defendants did not furnish the statutorily mandated wage notice and statements, they cannot be held liable for their violations of the NYLL. *See, e.g., De Oliveira v. Scores Holding Co. Inc.*, No. 18 Civ. 6769 (GBD), 2022 WL 874989, at *4 (S.D.N.Y. Mar. 24, 2022), *reconsideration denied*, 2022 WL 16926260 (S.D.N.Y. Nov. 14, 2022); *Belvin v. Electchester Mgmt. LLC*, No. 15 Civ. 4924 (KAM) (PK), 2020 WL 489532, at *8–9 (E.D.N.Y. Jan. 30, 2020).

---

[27] Sanchez's counsel conceded that the affirmative defense would apply if Sanchez did not prove an overtime violation. *See* Closings 5.

## CONCLUSION

In consideration of the foregoing findings of fact and conclusions of law, the Court finds that Sanchez has not proven, by a preponderance of the evidence, that defendants violated the FLSA and the NYLL by failing to pay overtime wages. Furthermore, although defendants violated the NYLL's wage notice and statement requirements, they are entitled to an affirmative defense as to those provisions because they properly compensated Sanchez for his work.

Accordingly, the Court holds for the defense on all claims. The Court respectfully directs the Clerk of Court to enter judgment for the defense and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 8, 2023
       New York, New York